# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GAIL HOLLANDER, | B308142 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC365455) |
| v. | |
| XL AMERICA GROUP et al., | ORDER FURTHER MODIFYING OPINION AND DENYING RESPONDENTS' PETITION FOR REHEARING |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion that was filed on June 16, 2022, and which was modified on June 28, 2022, is further modified as follows:

1.  On page 25, the first paragraph of footnote 19 is modified to read as follows:  "In their respondents' brief, defendants do not argue expressly that Gail waived or

forfeited her claim of instructional error by failing specifically to request an instruction that the Hollanders were not obligated to negotiate with XL Specialty reasonably and in good faith.  Rather, in a section of their respondents' brief that appears under the main heading 'Plaintiffs are Estopped by the "Invited Error" Doctrine from Challenging Special Instruction 1' and the subheading 'Plaintiffs should be estopped from raising arguments challenging Special Instruction 1 not raised below' (boldface omitted), defendants maintain that Gail 'should be barred from challenging Special Instruction 1' because she 'never submitted an "unfettered right" instruction . . . to the court.'  Insofar as defendants seek to invoke the forfeiture and/or waiver doctrines, they fail to do so properly.  (See *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ['Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.'].)  To the extent defendants contend the invited error doctrine estops Gail from arguing the Hollanders were not obligated to negotiate with XL Specialty reasonably and in good faith, we reject that contention for the reasons discussed in the textual paragraph accompanying this footnote."

2.      On page 31, a new footnote (i.e., fn. 22) is appended to the sentence that currently reads:  "As set forth in *Kransco* and the other authorities cited above, the trial court erred in wielding the implied covenant to defeat the purpose of the parties' bargain."  The text of new

2

footnote 22 is as follows: "In their petition for rehearing, defendants complain that neither side argued that requiring the Hollanders to negotiate loss in value in good faith would frustrate the purpose of paragraph 8 to expeditiously determine the loss in value and ensure prompt payment of the claim. We decline to order rehearing because this issue was fairly included within an argument raised on page 41 of Gail's opening brief— i.e., 'Th[e] objective approach to valuation [found in paragraph 8] prevents both XL [Specialty] and the policyholder from attacking the outcome produced by the agreed-upon formula as representing something other than the value that the restored artwork has lost.' (See *Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1015–1016, fn. 9 [' "[T]he parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis or authority that is raised or *fairly included* within the issues raised does not implicate the protections of [Government Code] section 68081[,]" ' italics added]; Gov. Code, § 68081 ['Before . . . a court of appeal . . . renders a decision . . . based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party.'].)" All subsequent footnote call numbers are renumbered accordingly.

3.  The sentence on page 34 that currently reads: "As defendants conceded at oral argument, *Brehm* is of limited relevance to this case" is deleted. Footnote 24 is also deleted from page 34, and all subsequent footnote call numbers are renumbered accordingly.

4.  The sentence on page 38 that currently reads: "At oral argument, defense counsel conceded that if Special Instruction No. 1 were erroneous, then the jury could award only $181,850 on the contract claim and not the $19,500 that it did award" is modified to read as follows: "At oral argument, defense counsel conceded that if Special Instruction No. 1 were erroneous, then the instructional error was prejudicial because, in that case, the postrestoration partial loss in value would be the $181,850 auction formula benefit."

5.  The short citation at the bottom of page 38 and at the top of page 39 is changed to the following full citation: "(See *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 475 ['counsel's concessions and admissions at oral argument are binding.'].)"

There is no change in the judgment.

4

Respondents' petition for rehearing is denied.

_____
ROTHSCHILD, P. J.          BENDIX, J.          MORI, J.*

_____
     **\*** Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GAIL HOLLANDER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>XL AMERICA GROUP et al.,<br><br>    Defendants and Respondents. | B308142<br><br>(Los Angeles County<br>Super. Ct. No. BC365455)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |

THE COURT:

It is ordered that the opinion filed on June 16, 2022 is modified as follows:

6.     The sentence on page 47 that currently reads:  "She, however, provides no analysis in support of her entitlement to an order instructing the trial court to enter judgment for her on the breach of contract claim" is modified to read as follows:  "In her appellate briefing,

however, she provides no analysis in support of her entitlement to an order instructing the trial court to enter judgment for her on the breach of contract claim."

7. On page 47, a new footnote (i.e., fn. 35) is appended to the sentence that currently reads: "For that reason alone, we need not address further Gail's request for a judgment awarding her $181,850 on her breach of contract claim." The text of new footnote 35 is as follows: "In Gail's petition for rehearing, she argues, for the first time, that we should instruct the trial court to enter judgment for her on the breach of contract claim in the amount of $181,850 'at such time as it is appropriate for the court to enter judgment.' She also argues for the first time in her petition that she is entitled to this instruction because the trial court's instructional error 'affected only an issue separate and distinct from the remainder of the appealed judgment or order' and defendants have not appealed from the judgment. We do not address these arguments because Gail did not timely raise them. (See *Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338, fn. 10 ['arguments first raised on rehearing are usually forfeited'].) We thus do not address whether or not the breach of contract claim should be retried upon remand."

8. On page 48, the following text is deleted: "This is not just a procedural concern. Although upon a retrial, the trial court's instructions must conform to our

interpretation of paragraph 8 herein, there may be other issues relating to the breach of contract claim not raised in the first trial or considered in this appeal. Accordingly, we are in no position to enter judgment in Gail's favor, and leave the scope of the retrial of Gail's claims to the sound discretion of the trial court."

9. On page 49, the call number for footnote 35 is changed to 36.

There is no change in the judgment.
Appellant Gail Hollander's petition for rehearing is denied.

_____
ROTHSCHILD, P. J.      BENDIX, J.      MORI, J.*

---

   * Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GAIL HOLLANDER, | B308142 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC365455) |
| v. | |
| XL AMERICA GROUP et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph M. Hammock, Judge.  Reversed.

A. Tod Hindin, Karen L. Hindin; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Appellant.

Hymes, Schreiber & Walden, Richard E. Walden; McCullough, Stephen O'Donnell and Elissa L. Isaacs for Defendants and Respondents.

_____

Although this litigation spans nearly 15 years and fills several bookcases, the key issue before us is relatively discrete: Did the trial court prejudicially err in instructing the jury to decide whether the insureds' failure to agree with the insurer on the partial loss of value of insured fine artwork damaged by a third party breached the implied covenant of good faith and fair dealing as to a "valued" policy,[1] which provides that if the insureds and insurer could not agree on partial loss in value, the insurer had to pay the difference between the scheduled value of the artwork and the net proceeds of the sale of the artwork at public auction?  We conclude the court erred in issuing that instruction, and we reverse the judgment because there is a reasonable chance that error affected the jury's verdict on the insureds' breach of contract and bad faith claims.

It is uncontested that the parties corresponded over a four-month period about the partial loss of value of the artwork, although the parties asserted widely different partial-loss valuations.  Ultimately, the insurer refused the insureds' valuation and told the insureds they had to obtain an appraisal before they could invoke the policy's auction remedy.  The insureds disagreed with the insurer's assertion that the policy conditioned its auction remedy on the insureds' first obtaining an appraisal.  The insureds then sold the paintings at public auction, which resulted in a shortfall of $181,850 between the scheduled value of the artwork ($399,000) and the net proceeds from the auction ($217,150).

---

[1] "A valued policy is one which expresses on its face an agreement that the thing insured shall be valued at a specified sum."  (Ins. Code, § 412.)

At some point prior to the sale, the insurer obtained an appraisal valuing the loss in value at up to 2.5 percent of the artwork's scheduled value, to wit, $9,975. The insureds demanded the insurer pay them the aforesaid $181,850 shortfall. It appears that the insurer made its first monetary offer to the insureds only after the auction and in response to this demand from the insureds. The offer was only $19,950. The insureds thereafter brought the instant action against, among others, the insurer for breach of contract and bad faith.

The trial court agreed with the insureds that the policy did not condition the auction valuation remedy on the insureds' obtaining an appraisal of the partial loss. The trial court nonetheless concluded that the implied covenant of good faith and fair dealing applied to the parties' negotiations over the partial loss in value to the artwork. It then instructed the jury that it could award less than the difference between the scheduled value and the net auction proceeds if the insureds did not discharge this duty imposed by the implied covenant and the insurer satisfied its reciprocal obligation to negotiate in good faith. In effect, the court instructed the jury that even if it found the insurer breached the insurance policy, the jury could award less than the amount calculated in accordance with the aforesaid public auction formula based on the jury's assessment of the sincerity and reasonableness of the insureds' negotiations with the insurer.

And that is what the jury did. The jury found in favor of the surviving insured on her breach of contract claim,[2] but

---

[2] One of the two insureds died prior to trial. The remaining insured, appellant Gail Hollander, prosecutes this

3

awarded only $19,500, even though the uncontested difference between the scheduled value of the artwork and the net proceeds from the auction was $181,850. The jury then returned a special finding that the insurer did not act unreasonably or without proper cause in handling the insureds' claim under the policy, thereby negating the insurer's liability on the bad faith cause of action.

We conclude that the trial court's instruction constituted prejudicial error as to both causes of action, and we reject the insurer's claim that its insureds invited this instructional error.

As explained in greater detail in our Discussion, the policy set forth expeditious procedures for determining partial loss of value to damaged fine artwork. There were two components to these procedures: (1) The opportunity first to negotiate that value, and, if the parties could not agree, then (2) the artwork would be sold at public auction with the insurer paying the difference between the scheduled value of the artwork and the net proceeds from the public auction. This bargain benefited both the insureds and the insurer in avoiding protracted and costly litigation concerning the partial loss in value to the artwork. The trial court's erroneous instruction derailed that bargain under the guise of enforcing the covenant of good faith and fair dealing.

The trial court also awarded over $660,000 in costs in favor of the insurer and the other defendants. Because we reverse the judgment, including the costs award, we need not further address the surviving insured's challenges to that award.

---

appeal in her individual capacity, as the executor of her late husband's estate, and as the trustee of the Hollander living trust.

4

## FACTUAL AND PROCEDURAL BACKGROUND[3]

We summarize only those facts that are relevant to our disposition of this appeal.

1. ***The Hollanders Insured Their Art Collection with XL Specialty***

Gail and Stanley Hollander (collectively, the Hollanders),[4] a married couple, acquired an art collection over a period of time. (See *Hollander v. XL Capital Ltd.* (May 1, 2018, B276621) [nonpub. opn.] (*Hollander VII*) [indicating Gail and Stanley were married].)[5]  In exchange for a premium of $24,966, XL Specialty Insurance Company (XL Specialty) issued the Hollanders an insurance policy, effective from March 2, 2005 to March 2, 2006, that covered their fine art.  In the event the fine art were destroyed, the Hollanders would be entitled to collect the "scheduled value" of the property—i.e., the amount assigned to the artwork in a schedule to the policy.

---

[3] We derive our Factual and Procedural Background in part from undisputed portions of the parties' filings.  (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 (*Artal*) [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party. [Citations.]'  [Citations.]"].)

[4] For the sake of clarity, and meaning no disrespect, when we refer to Gail and Stanley Hollander individually, we use their first names.

[5] We, sua sponte, take judicial notice of our prior opinion from *Hollander VII*.  (Evid. Code, §§ 452, subd. (d), 459.)

Paragraph 8 of the policy provides a different method of valuation in the case of a "partial loss" to the fine art.[6] That portion of the policy provides in full:

"PARTIAL LOSS AGREEMENT[ ](As Respects Fine Arts Only)

"In case of Partial Loss to Perils insured against, the adjusted amount of Loss shall be the cost and expense of Restoration, to include additional and reasonable charges incurred in that Restoration.

"Loss in value, if any, after Restoration, to be agreed upon between the Insured and the Company.

"In the event the Insured and the Company cannot agree on the amount of loss in value, the Property will be sold at public auction and the net proceeds shall inure to the Insured. The Company will pay the Insured the difference between the amount so realized and the insured value of the Property.[7]

"In no event shall the Company be liable for more than the insured value of the Property."

We observe that this insurance contract between XL Specialty and the Hollanders is "[a] valued policy"—i.e., "one which expresses on its face an agreement that the thing insured shall be valued at a specified sum." (See Ins. Code, § 412.) This type of contract differs from an "open policy" "in which the value

---

[6] Neither party contests the trial court's ruling that paragraph 8 applies to this case.

[7] The parties do not dispute that the "insured value of the Property" for the purposes of paragraph 8 is its scheduled value. Additionally, as a shorthand, we refer to the difference between the "net proceeds" of the public auction and the scheduled value of the property as the "auction formula benefit."

6

of the subject matter is not agreed upon, but is left to be ascertained in case of loss." (See *id.*, § 411 [defining "open policy"]; see also *id.*, § 410 ["A policy is either open or valued."].) " 'A valued policy is "seldom if ever written in this state" since it is subject "to the moral hazard of over evaluation." ' " (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1129.)

## 2. *After Three of the Hollanders' Paintings Were Damaged, the Hollanders Submitted a Claim to XL Specialty, and the Paintings Were Sent to Germany for Restoration*

On January 9, 2006, an employee from L.A. Packing, Crating, and Transport, Inc. (L.A. Packing) damaged three paintings from the Hollanders' collection. The paintings were created by a deceased German painter named Martin Kippenberger[8] (Kippenberger paintings), and had a total scheduled value of $399,000, or $133,000 each. The L.A. Packing employee damaged the artwork by detaching the cardboard frames from each of the three paintings.

Within the next two days, the Hollanders submitted a claim for the loss to XL Specialty. An XL Specialty employee named Natasha Fekula thereafter handled the Hollanders' claim.[9]

In or about early March 2006, the Kippenberger paintings were shipped to the Estate of Martin Kippenberger in Germany

---

[8] Kippenberger died in 1997.

[9] Gail alleges Fekula was XL Specialty's "claims manager," whereas defendants claim she was "XL Specialty's claim adjuster." This discrepancy has no impact on the instant appeal.

for restoration. The Estate affixed new cardboard frames to the paintings, and sent the restored paintings back to the Hollanders in June 2006. Gail does not dispute, and thus tacitly agrees with, defendants' assertion that "XL Specialty paid for the restoration and shipping, as required by the Policy."[10]

### 3. *The Hollanders and XL Specialty Failed to Agree on the Loss in Value to the Paintings*

On July 7, 2006, Stanley sent a letter to Fekula.[11] In the letter, Stanley stated he and his wife "believe[d] that the paintings . . . declined substantially in value" because "the damaged painted frames" and "the restored painted frames . . . [we]re very dissimilar." Stanley stated he and Gail were "willing to accept a valuation for the three paintings in their damaged ('restored') condition of 70,000 pounds ($129,500 at the exchange rate of $1.85 to the pound)." Stanley said that because "[t]he paintings were insured for $399,000[,] . . . the amount of the loss [was] $269,500 . . . ." Stanley also stated that if XL Specialty did not agree that the Hollanders were entitled to $269,500, then they "intend[ed] to sell the paintings at public auction at [Sotheby's auction house in London] on October 3, 2006 and expect[ed XL Specialty] to reimburse [them] for the difference between the net sum [the Hollanders would] receive from the sale

---

[10] (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

[11] Although the letter employs the plural first-person pronoun "[w]e," it is signed by only Stanley, and Gail's signature line is blank.

8

(the commission charged by Sotheby['s] [they] expect[ed] to be 7 ½ %) and the $399,000 insured value."**12**

On September 15, 2006, Fekula sent an e-mail to Stanley, wherein which she stated "XL [Specialty] w[ould] not guarantee the sale of the works at auction at th[at] time." She stated that, "[p]ursuant to [the] policy, loss in value, if any, will be determined by competent and disinterested appraisers," and, "[i]f, after the appraisals, we cannot agree on a loss in value, then the property will be sold at public auction."

Similarly, Fekula sent a letter to the Hollanders on or about October 2, 2006, stating that "the Policy provides for a *process* that includes restoration of the Work, a good faith appraisal of the loss in value (if any) following the restoration and then—and only then—an auction if [the Hollanders] and [XL Specialty] cannot agree on the amount of the loss." Fekula further asserted that "[t]he Policy requires that [the Hollanders] participate in that process and attempt to reach agreement on the loss in value," and that "the qualified opinion of an appropriate expert or appraiser" would constitute "acceptable proof of loss . . . ." She claimed that the Hollanders had "refused to permit an appraiser designated by [XL Specialty] to examine the paintings," which she asserted had "thwarted [XL Specialty's] ability to even make a proposal to [the Hollanders] to see if [XL Specialty and the Hollanders] can reach agreement as, again, is required by the Policy." Fekula stated that her company

---

**12** Gail asserts in her opening brief that Fekula did not respond to the July 7, 2006 letter. Defendants do not address that contention in their respondents' brief. In any event, this disparity has no impact on our disposition of the instant appeal.

9

would "not pay the difference (if any) between the auction proceeds and the insured value."

On or about October 3, 2006, the Hollanders sent Fekula a letter, wherein they stated that "if [XL Specialty] wish[ed] to employ an appraiser as a consultant to assist [it] in arriving at [its] opinion of the amount of loss, [the Hollanders] ha[d] no objection." The Hollanders did object, however, to XL Specialty's assertion that the "policy require[d them] to participate in an appraisal proceeding before establishing the partial loss through public auction." They claimed that their opinion on the artwork's loss in value provided in the July 7, 2006 letter was "[b]ased upon Sotheby's advice as well as [the Hollanders'] own knowledge as experienced fine arts' collectors . . . ." The Hollanders stated that if XL Specialty did not agree with the Hollanders' "opinion of loss" after inspecting the paintings, "then the artworks w[ould] be sold on October 14, 2006 at public auction [at Sotheby's London] and [XL Specialty] w[ould] be required under the terms [of] paragraph 8 of the policy . . . to compensate [the Hollanders] for the difference between the sale price at public auction and the insured value." Gail claims Fekula did not respond to this letter.

The parties do not dispute that after the Kippenberger paintings were restored but before they were sold at auction, an appraiser retained by XL Specialty examined the artwork and concluded it had lost up to 2.5 percent of its scheduled value, to wit, $9,975.

4.      ***The Kippenberger Paintings Were Sold at Public Auction, and XL Specialty Refused the Hollanders' Request for the Auction Formula Benefit***

On October 14, 2006, the three Kippenberger paintings were sold at public auction at Sotheby's auction house in London.

In a letter dated October 16, 2006, the Hollanders informed Fekula of the transaction, and stated that the sale price was "125,000 pounds sterling or $233,500.00 at an exchange rate of $1.87 per pound sterling." The Hollanders claimed that "[t]he insured value of the artworks was $399,000," "[t]he seller's commission . . . was seven percent (7%) or $16,345," and the Hollanders' "net proceeds from the sale exclusive of the freight costs in transporting the artworks to the auction site and the incidental charges imposed by Sotheby's w[ould] be approximately $217,150." The Hollanders requested that XL Specialty send them a "check for the sum of $181,850" and a proof of loss form for that amount.

In a letter dated October 31, 2006, XL Specialty's attorney told the Hollanders that he could not "advise XL [Specialty] to pay the amount of [their] claims or to certify the amount of the loss." Counsel stated he "would suggest that XL [Specialty] pay [the Hollanders] up to five percent of the insured value [(i.e., $19,950)] which, under the circumstances, would be generous." The attorney further claimed that XL Specialty's retained appraiser opined that the paintings had "a loss in value of just two-and-one-half percent." Counsel stated he "hope[d] that [the Hollanders would] seriously consider XL[ Specialty's] offer." It appears that this is the first occasion on which XL Specialty

11

made a specific monetary offer to compensate the Hollanders for the partial loss in value to the artwork.

**5.** ***The Hollanders Brought Suit Against Defendants, and the Parties Engaged in Protracted Pretrial Proceedings***

On January 29, 2007, the Hollanders filed a verified complaint against L.A. Packing, defendants,[13] and several other entities for breach of contract, insurance bad faith, promissory fraud, violation of Insurance Code section 785 et seq., and negligence.

On December 9, 2008, XL Specialty filed a cross-complaint against the Hollanders, seeking, inter alia, rescission of the insurance policy.

In July 2009, the Hollanders settled their claims against L.A. Packing for $250,000.

Prior to the commencement of the trial in spring 2019 (Factual and Procedural Background, part 6, *post* [noting that the trial was held in April and May 2019]), the parties litigated a plethora of pretrial matters, several of which were reviewed by this court; none of them is relevant to the instant appeal. Additionally, Stanley was unable to participate in the trial because he died in 2016. (*Hollander VII*, *supra*, B276621.)

---

[13] We use the designation "defendants" to refer to the following nine entities that are respondents to this appeal: (1) XL Specialty; (2) XL Select Insurance Company; (3) Greenwich Insurance Company; (4) XL Insurance America, Inc.; (5) XL Insurance Company of New York, Inc.; (6) XL Re, Ltd; (7) XL Reinsurance America, Inc.; (8) Indian Harbor Insurance Company; and (9) XL America Group.

## 6.     *Phases I and II of the Trial*

The lower court bifurcated the trial into two phases: Phase I concerned XL Specialty's rescission cross-claim, and during phase II, the jury would decide Gail's claims for breach of contract and bad faith against XL Specialty. The court ruled that, if necessary, the trial would thereafter proceed to a third phase to determine whether defendants other than XL Specialty were liable for its alleged misconduct.

The trial commenced on April 15, 2019. Gail prevailed against XL Specialty at the conclusion of phase I.

Before submitting the matter to the jury in phase II, the trial court issued Special Instruction No. 1. Special Instruction No. 1 provides in full:

"It is the duty and responsibility of this Court to interpret the provisions of the contract between the parties under established legal principles of contract construction and interpretation. Under the law, it is your responsibility to accept and follow my interpretation of the meaning of the terms of the contract, whether you agree with this interpretation or not.

"There is a *mutual* obligation of good faith and fair dealing implied in every contract, including the insurance policy at issue in this case. With respect to Paragraph 8 of the insurance policy between XL Specialty and the Hollanders, this obligation required both parties to try to reach agreement in good faith on 'loss in value,' if any, to the Kippenberger paintings following restoration of the damage to the cardboard frames.

"Under Paragraph 8, the Hollanders were only entitled to sell the paintings at auction if: (a) they made reasonable and good faith efforts to reach agreement as to 'loss in value,' if any, to the paintings following the restoration, or (b) if XL [Specialty]

13

failed to make reasonable and good faith efforts to reach agreement on the 'loss in value,' if any, to the paintings following the restoration.

"Accordingly, if you find that the Hollanders attempted, in good faith, to reach an agreement on 'loss in value,' if any, following the restoration, then the Hollanders are entitled to collect from XL Specialty the $181,850 difference between the scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders.[14]

If, on the other hand, you find that the Hollanders did not try in good faith to reach an agreement with XL Specialty on 'loss in value,' if any, following the restoration, then the Hollanders are not entitled to collect from XL Specialty the $181,850 difference between the scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders. In such event, the Hollanders are only entitled to collect whatever amount you find to be the reasonable 'loss in value,' if any, to the paintings following the restoration.

"Alternatively, if you find that XL Specialty did not attempt, in good faith, to reach an agreement on 'loss in value,' if any, following the restoration, then the Hollanders are entitled to collect from XL Specialty the $181,850 difference between the

---

[14] The parties do not dispute that, although this instruction indicates that $181,850 is the "difference between the scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders," this figure actually corresponds to "the difference between the scheduled value of $399,000 and the *net* auction proceeds of $217,150," (italics added), i.e., the auction formula benefit. This potential ambiguity has no ultimate bearing on our resolution of this appeal.

14

scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders.

"You have also heard or seen reference during trial to Paragraph 25 of the insurance policy, which is titled 'APPRAISAL.' Paragraph 25 does not directly apply to any 'partial loss' of 'fine arts' and therefore does not directly apply to the Hollanders' claim.[15]

"In any case, the insurance policy did not require the Hollanders to procure an appraisal of their paintings before exercising their rights under paragraph 8 of the insurance policy, as described above."

On May 10, 2019, the jury rendered a general verdict with special findings for phase II. In pertinent part, this verdict form provides: "AS TO THE BREACH OF CONTRACT CLAIM . . . [¶] . . . [w]e, the jury, find in favor of Plaintiff and per the Special

---

[15] Paragraph 25 of the policy provides:

"APPRAISAL

"If the Insured and the company fail to agree as to the amount of loss, each shall, on the written demand of either, made within sixty (60) days after receipt of proof of loss by the company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen days to agree upon such umpire, then, on the request of the Insured or the Company, such umpire shall be selected by a judge of a court of record in the State in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss."

15

Instruction No. 1 we award her the total sum of $19,500." Nine jurors voted in favor of that verdict, and three voted against it.

The verdict form further indicates that 11 jurors answered "[n]o" and one juror answered "[y]es" to the following "Special Question": "Did XL SPECIALTY INSURANCE COMPANY unreasonably or without proper cause breach the covenant of good faith and fair dealing that it owed to the HOLLANDERS in the handling of the Kippenberger claim?" (Underscoring omitted.) Because the form instructed the jury not to answer any further questions thereon if its answer to this Special Question was "[n]o," the remainder of the form does not include any further responses from the jury. After the jury rendered its verdict for phase II, the trial court dismissed the jurors.

### 7.     *The Initial and Corrected Judgments*

On July 16, 2020, the trial court entered a judgment on the jury verdict (initial judgment). The initial judgment recited, "Following the hearing of post-trial motions, on June 24, 2020, XL Specialty was awarded its post-statutory offer to compromise costs, in the amount of $366,332.00, less the jury verdict of $19,500.00, for a total of $346,832.00 in total post-statutory offer to compromise costs." It further provided that judgment was "entered in favor of XL Specialty, and against [Gail] and the Estate[ of Stanley], jointly and severally, in the amount of $346,832.00." The initial judgment also allowed "XL Specialty [to] file a Memorandum of Costs to recover its pre-statutory offer to compromise costs from Plaintiff . . . ."

On October 2, 2020, the trial court issued a corrected judgment on the jury verdict (corrected judgment). The corrected judgment recites: "Following the hearing of Post-Trial motions, including the parties' motions to be deemed prevailing parties, on

16

June 24, 2020, the Court ruled that [defendants] . . . were the prevailing parties. The Court awarded . . . [d]efendants their post-statutory offer to compromise costs in the amount of $366,332.00, less the jury verdict of $19,500.00, for a total of $346,832.00." The corrected judgment also states: "Following the hearing of additional Post-Trial motions, on September 9, 2020, the Court awarded . . . [d]efendants their pre-statutory offer to compromise costs, in the amount of $318,030.61. [¶] Thus, the Court awarded . . . [d]efendants a total of $664,862.61 in costs incurred before and after their April 5, 2019, offer to compromise." It further provided that judgment was entered in favor of defendants and against Gail, "individually and as Executor of the Estate of Stanley Hollander, jointly and severally, in the amount of $664,862.61."

On October 2, 2020, Gail, individually, as executor of Stanley's estate, and as trustee of the Hollander living trust dated March 13, 1995, appealed the initial and corrected judgments.[16]

---

[16] Defendants do not challenge the timeliness of Gail's October 2, 2020 notice of appeal. In any event, we observe that even if the date of entry of the initial judgment were the starting point for calculating the deadline by which Gail was required to seek review of any of the rulings challenged on appeal (e.g., the trial court's issuance of Special Instruction No. 1 to the jury), her appeal would still be timely. This is because Gail filed and served a notice of intention to move for a new trial on July 29, 2020, and the trial court denied her new trial motion on September 9, 2020, thus permitting Gail to appeal the initial judgment within 30 days of service of the order denying her new trial motion. (See Cal. Rules of Court, rule 8.108(b) ["If any party serves and files a valid notice of intention to move for a new trial, the following extensions of time apply: [¶] (1) If the motion for a

17

## STANDARD OF REVIEW

" 'The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect.' [Citation.]  'Accordingly, "[a]n appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation]." ' [Citation.]"  (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1323.)  Insofar as a trial court construes a contract based solely on its terms and issues an instruction to the jury based on that construction, an appellate challenge to that instruction "present[s] legal questions that are properly reviewed de novo."  (See *id.* at p. 1326.)

We apply the de novo standard to review Gail's claim of instructional error because the trial court did not rely upon extrinsic evidence in construing paragraph 8 of the policy (see Discussion, part A, *post* [indicating the trial court's interpretation was based on its conception of the implied covenant of good faith and fair dealing]), and the parties agree that this is the proper standard.

---

new trial is denied, the time to appeal from the judgment is extended for all parties until the earliest of:  [¶] (A) 30 days after the superior court clerk or a party serves an order denying the motion or a notice of entry of that order; [¶] (B) 30 days after denial of the motion by operation of law; or [¶] (C) 180 days after entry of judgment."].)

## DISCUSSION

### A. The Invited Error Doctrine Does Not Bar Gail from Challenging Special Instruction No. 1

" 'Under the doctrine of invited error, where a party, by his [or her] conduct, induces the commission of an error, he [or she] is estopped from asserting it as grounds for reversal. [Citations.] . . .' [Citations.]  The purpose of the invited error doctrine is to 'prevent a party from misleading the trial court and then profiting therefrom in the appellate court.' [Citation.]" (*Hood v. Gonzales* (2019) 43 Cal.App.5th 57, 70 (*Hood*).)

Defendants argue that Gail is "estopped by the 'invited error' doctrine from challenging Special Instruction 1." (Boldface & some capitalization omitted.)  First, defendants contend the invited error doctrine applies because Gail "never objected to the language in Special Instruction 1" and "drafted the very instructional language [she] now claim[s] was erroneous."  Second, defendants complain that during the trial court proceedings, Gail did not argue, or request jury instructions to the effect that, (a) she and Stanley "had an unfettered right to sell the paintings at auction and collect the auction [formula] benefit" and (b) "their failure to negotiate loss in value in good faith was, at most, a breach of the duty to cooperate, which requires the insurer to show prejudice."  For the reasons discussed below, we conclude the invited error doctrine does not preclude Gail from contesting Special Instruction No. 1.

Concerning their first contention, defendants seem to argue that by submitting two proposed jury instructions that the trial court rejected—to wit, Gail's proposed Special Instruction Nos. 25 and 25A—Gail induced the instructional error of which she complains on appeal.  Defendants point out that proposed Special

19

Instruction No. 25 "did *not* state that [the Hollanders] had an unfettered right to sell the paintings at auction and collect the auction [formula] benefit," but instead "provided that the jury should award [Gail] the auction [formula] benefit if it found [the Hollanders] had a 'genuine' dispute with XL Specialty over loss-in-value . . . ." They also correctly observe that Gail later submitted her proposed Special Instruction No. 25A, which "provided, among other things, that the jury should award [Gail] the auction [formula] benefit if it found [the Hollanders] made a 'reasonable good faith effort[ ]' to agree with XL Specialty on loss-in-value." Defendants observe that Special Instruction No. 1 included language similar to that proposed in Gail's Special Instruction No. 25A—i.e., that the Hollanders were "entitled to sell the paintings at auction if . . . they made reasonable and good faith efforts to reach agreement as to 'loss in value[.]' " They argue that Gail's "submission of [her] proposed Special Instructions 25 and 25A was . . . part of [her] tactical effort to persuade the trial court to instruct the jury that [the Hollanders] had no obligation to obtain a lost value appraisal," and that "[t]his tactic was successful" because Special Instruction No. 1 told the jury the "policy did not require the Hollanders to procure an appraisal of their paintings before exercising their rights under paragraph 8 . . . ."

Notwithstanding defendants' argument to the contrary, the record shows Gail's submission of proposed Special Instruction Nos. 25 and 25A did not induce the trial court to commit the instructional error of which she complains.

During the proceedings below, Gail filed motion in limine No. 27, which asked the court to "try the legal issue of the interpretation of [the] insurance policy first before any other

20

issues . . . ." The court heard the motion after phase I of the trial concluded but before the commencement of phase II. At the hearing, the court found the motion was "a little premature" yet announced its intent to "giv[e] [the parties] some guidance." The court stated its "belie[f]" that "there is an implied duty of [the Hollanders] to attempt to resolve the issue of loss of use [*sic*] in good faith." Gail's counsel insisted that "the contract says that if the parties aren't able to agree, . . . the Hollanders have the right to sell the paintings at public auction, and there is no other conditions precedent," but the court responded that "there is some implied duty to do that condition in good faith" and that counsel's interpretation "can't be the law" and "can't be the situation."[17] The court ultimately deferred ruling on motion in

---

[17] Defendants argue that Gail's counsel agreed with "the trial judge at the MIL 27 hearing that attempting to agree on loss in value in good faith is a condition precedent to the auction formula under the contract." This is not a fair reading of the reporter's transcript. Admittedly, one of Gail's attorneys replied, "Right" after the trial court stated the Hollanders "had the unilateral right to sell . . . at an auction" if they "did attempt in good faith to negotiate or to resolve . . . the loss of value of the paintings . . . ." Yet, Gail's lawyers also stated that they were "not agreeing with [defendants'] position" that the Hollanders had to act in good faith to try to resolve the loss in value issue, and counsel indicated they did not agree with the court's assertions that "the covenant of good faith and fair dealing is a two-way street" and that the Hollanders "just can't arbitrarily" decide to sell the paintings at auction. Thus, the excerpt of the transcript cited by defendants shows only that Gail's counsel was acknowledging the court's interpretation of the contract, and not that the attorney was conceding this construction was correct.

limine No. 27, and observed that this interpretive issue could arise again when formulating jury instructions.

Although at one point during the motion hearing the trial court characterized its statements concerning this implied duty of good faith as "the legal ruling" on this point, the court later intimated it had simply provided the parties with "tentative thoughts to guide [them] in [their] case." Nevertheless, the court's remarks indicate that before Gail submitted her proposed Special Instruction Nos. 25 and 25A during phase II of the trial, the court was inclined to find the Hollanders had this implied duty of good faith.

The trial court later made statements further demonstrating that its interpretation of paragraph 8 was not prompted by Gail's submission of proposed Special Instruction Nos. 25 and 25A. The parties began discussing the phase II jury instructions on May 7, 2019. Prior to that first jury instruction conference, Gail's counsel submitted proposed Special Instruction No. 25 to the court, and an insurance law practitioner named Anthony Cannon testified for the defense. Defense counsel asked Cannon, "In order to trigger the public auction, what has to happen under this policy?" Cannon replied, "A good faith negotiation between the Hollanders and [XL Specialty] needs to take place, a back and forth with documented positions and competent evidence of values needs to be undertaken. [¶] And then[,] . . . only if they cannot agree . . . after properly documenting their view, then public auction." Cannon indicated he believed this obligation stemmed from "the implied covenant of good faith and fair dealing that each [party] will not do anything to frustrate the other side's reasonable expectations under the policy."

During the jury instruction conference held later that day, the trial court stated it "completely agree[d] with Mr. Cannon's interpretation of that policy when it came to loss in value." Although the trial court at first indicated that it did not wish to "rule on this as a matter of law," the court later on during the conference called this interpretation of the policy its "ruling" on this issue. Additionally, when the trial court at one point reiterated its conclusion that a duty of "good faith" applied to paragraph 8, Gail's counsel noted that his client "preserv[ed her] objection" thereto.[18] The court replied, "Of course," and acknowledged that the Court of Appeal may ultimately disagree with the trial court's interpretive ruling. At the close of the conference on May 7, 2019, the trial court directed the parties to submit proposed instructions that "just tell[ the jury] exactly what [the court] just said."

Following the May 7, 2019 conference, Gail submitted her proposed Special Instruction No. 25A for the court's review. On May 8, 2019, the trial court remarked that both sides had provided it with proposed special instructions "trying to codify what [the court] said," and that the parties "captured the essence of what [the court] decided" "as a matter of law" the previous day—i.e., "there is an implied covenant of good faith and fair dealing" that required "both parties . . . to attempt in good faith to resolve the issue of loss in value, if any" after restoration. Later that day, the trial court provided the parties with a draft

---

[18] This excerpt from the reporter's transcript undercuts defendants' assertion that by stating during the conference that the trial court could substitute "good faith dispute" for "genuine dispute" in proposed Special Instruction No. 25, Gail's counsel was agreeing with the court's interpretation of paragraph 8.

23

version of Special Instruction No. 1 and asked Gail's attorneys whether they had any objection to it. One of Gail's lawyers stated that he objected because the draft instruction was "a rewriting of the insurance contract which is not permitted . . . ." The court responded that Gail's counsel had "reserved all rights . . . ad nauseam," and then asked if the draft instruction was "consistent with [the court's] rulings . . . ." One of Gail's other lawyers then conceded the draft instruction was consistent with the court's prior rulings.

Thus, Gail's submission of proposed Special Instruction Nos. 25 and 25A did not cause the trial court to issue Special Instruction No. 1. As a matter of fact, the record reveals Gail's counsel repeatedly objected to the trial court's assertion that Gail could recover the auction formula benefit only if she and Stanley attempted in good faith to reach an agreement with XL Specialty on the loss in value. Accordingly, we reject defendants' claim that Gail triggered the invited error doctrine by "draft[ing] the very language [she] now claim[s] was erroneous . . . ." (See *Hood*, *supra*, 43 Cal.App.5th at p. 70 [holding the invited error doctrine applies "where a party . . . *induces* the commission of an error," italics added]; cf. *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 376–378 [concluding that the invited error doctrine did not apply to the appellant's legal theory because "[t]he trial court's comments on the record at . . . two hearings clearly show that it ruled [the legal theory] did not apply because of its own determination of the merits[,] . . . not because of the argument of [appellant's] counsel"].)

Furthermore, the record belies defendants' claim that Gail did not argue during the proceedings below that she and Stanley had an unfettered right to sell the paintings at auction and

24

collect the auction formula benefit. For instance, at the hearing on Gail's motion in limine No. 27, her counsel explicitly told the court: "I . . . want you to find that the contract says that if the parties aren't able to agree, that the Hollanders have the right to sell the paintings at public auction, and *there [are] no other conditions precedent*." (Italics added.) And, because the record evidence discussed above shows the trial court issued Special Instruction No. 1 notwithstanding Gail's recurrent objections to the court's interpretation of paragraph 8, Gail's failure to request specifically an instruction stating that she and Stanley had no obligation to negotiate with XL Specialty reasonably and in good faith did not induce the instructional error she raises on appeal.[19]

In any event, regardless of whether the invited error doctrine could apply to this case, we have discretion to proceed to the merits of Gail's challenge to Special Instruction No. 1. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs

---

[19] Defendants do not argue that Gail waived or forfeited her claim of instructional error by failing specifically to request an instruction they were not obligated to negotiate with XL Specialty reasonably and in good faith. Instead, defendants apparently contend the invited error doctrine estops her from raising the contention on appeal. We reject that argument for the reasons discussed in the textual paragraph accompanying this footnote.

Additionally, Gail argues that the Hollanders' failure to negotiate loss in value in good faith was, at most, a breach of the duty to cooperate that is not actionable unless the insurer demonstrates prejudice. Because we agree with Gail that the implied covenant was inapplicable, it is unnecessary for us to decide whether Gail is estopped from asserting her contention regarding the duty to cooperate.

(The Rutter Group 2021) ¶ 8:248.13, p. 8–186 ["Application of the doctrine of invited error is *not automatic*; it is *discretionary* with the appellate court."]; see also *People v. Ketchel* (1966) 63 Cal.2d 859, 865–866, fn. 3 ["[I]t is not every case in which the doctrine of invited error will preclude a defendant from complaining of the error on appeal."].) As we explained in our Standard of Review, *ante*, the trial court's interpretation of paragraph 8 presents a purely legal question that is subject to de novo review. Even if arguendo the invited error doctrine did apply, we would exercise our discretion to reach this purely legal question. (Cf. *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 298, fn. 2 ["[A]pplication of the forfeiture rule 'is not automatic.' [Citation.] When an appellant raises a question of law, for example, the appellate court can exercise its discretion to address the issue.' [Citation.]"].)

## B. The Trial Court Erred in Imposing Upon the Hollanders the Duty to Make Reasonable and Good Faith Efforts to Reach Agreement on the Postrestoration Partial Loss in Value

As we set forth in our Factual and Procedural Background, paragraph 8 of the insurance policy provides: "Loss in value, if any, after Restoration, to be agreed upon between the Insured and the Company." It further provides: "In the event the Insured and the Company cannot agree on the amount of loss in value, the Property will be sold at public auction and the net proceeds shall inure to the Insured. The Company will pay the Insured the difference between the amount so realized and the insured value of the Property." In this way, the policy expressly cabins the value of any postrestoration partial loss at the

26

difference between the scheduled value listed in an endorsement to the policy[20] and the "net proceeds" received in a public auction.

The trial court informed the jury in Special Instruction No. 1 that "[t]here is a *mutual* obligation of good faith and fair dealing implied in every contract, including the insurance policy at issue in this case," and that, "[w]ith respect to Paragraph 8 of the insurance policy between XL Specialty and the Hollanders, this obligation required both parties to try to reach agreement in good faith on 'loss in value,' if any, to the Kippenberger paintings following restoration of the damage to the cardboard frames." The instruction also stated that, "[u]nder Paragraph 8, the Hollanders were only entitled to sell the paintings at auction if: (a) they made reasonable and good faith efforts to reach agreement as to 'loss in value,' if any, to the paintings following the restoration, or (b) if XL [Specialty] failed to make reasonable and good faith efforts to reach agreement on the 'loss in value,' if any, to the paintings following the restoration."

The court further instructed the jury: "If . . . you find that the Hollanders did not try in good faith to reach an agreement with XL Specialty on 'loss in value,' if any, following the restoration, then the Hollanders are not entitled to collect from XL Specialty the $181,850 difference between the scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders. In such event, the Hollanders are only entitled to collect whatever amount you find to be the

---

[20] Defendants concede that XL Specialty issued an endorsement to the policy that set the scheduled value for the paintings at $399,000. (See *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2 [noting that a statement in a brief may be deemed an admission against that party].)

27

reasonable 'loss in value,' if any, to the paintings following the restoration."

As a preliminary matter, we agree with the trial court that " '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement,' " and that "[t]his principle applies equally to insurance policies, which are a category of contracts." (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 (*Kransco*).)

The question presented is whether the trial court erred in holding that the implied covenant in the instant policy required the Hollanders to negotiate the postrestoration partial loss in value with XL Specialty reasonably and in good faith—i.e., whether such an obligation falls within the scope of the implied covenant. As explained in greater detail below, we conclude the court's instruction was erroneous because it ran afoul of a key limitation on the scope of the covenant of good faith and fair dealing, that is the covenant cannot be implied to defeat the purpose of the contract.

"The scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract because the covenant 'is aimed at making effective the agreement's promises.' [Citations.]" (*Kransco*, *supra*, 23 Cal.4th at p. 400.) As a corollary to that rule, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342,

28

373 (*Carma Developers (Cal.), Inc.*).)[21]  Put differently, " ' "[t]he
precise nature and extent of the duty imposed by [the implied
covenant] will depend on the contractual purposes."  [Citation.]' "
(See *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917,
937; see also *Grebow v. Mercury Ins. Co.* (2015) 241 Cal.App.4th
564, 578–579 [" 'A court may find an implied contract provision
only if [(inter alia)] . . . the implication either arises from the
contract's express language or is indispensable to effectuating the
parties' intentions.' "].)

　　In accordance with this principle, courts have recognized
"[t]he importance of identifying the purpose of the parties'
contract *before* considering the covenant as an aid in
construction" of the contract.  (See *Ellis v. Chevron, U. S. A., Inc.*
(1988) 201 Cal.App.3d 132, 139.)  "The purpose of a writing must
be ascertained solely from a common-sense meaning of it as a
whole with a view to effectuate the mutual intention of the
parties."  (*Broome v. Broome* (1951) 104 Cal.App.2d 148, 157.)

　　Here, the purpose of paragraph 8 is clear from the policy
language itself—in the event the parties could not agree on the
postrestoration partial loss in value to the damaged artwork, the
market would determine that value through a public auction
process.  Thus, paragraph 8 first provides:  "Loss in value, if any,
after Restoration, to be agreed upon between the Insured and the

_____

**21**  We acknowledge that *Carma Developers (Cal.), Inc.*
construed a commercial lease.  (See *Carma Developers (Cal.), Inc.*,
*supra*, 2 Cal.4th at p. 350.)  Nevertheless, decisions interpreting
contracts other than insurance policies are instructive because
"[i]nterpretation of an insurance policy . . . follows the general
rules of contract interpretation."  (See *MacKinnon v. Truck Ins.
Exchange* (2003) 31 Cal.4th 635, 647.)

Company."  Failing such agreement, or in the language of the policy—"[i]n the event the Insured and the Company cannot agree on the amount of loss in value"—then "the Property will be sold at public auction and the net proceeds shall inure to the Insured.  The Company will pay the Insured the difference between the amount so realized and the insured value of the Property."

In this way, the public auction formula in paragraph 8 serves a purpose similar to that of liquidated damages.  " ' "The term 'liquidated damages' is used to indicate an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement, and which may not ordinarily be modified or altered when damages actually result from nonperformance of the contract." [Citation.] "Liquidated damages constitute a sum which a contracting party agrees to pay . . . for breach of some contractual obligation." ' [Citation.]" (*Graylee v. Castro* (2020) 52 Cal.App.5th 1107, 1114.) An enforceable liquidated damages clause allows the parties to "avoid the cost, difficulty, and delay of proving damages" resulting from a breach.  (See 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 537, p. 562.)

The apparent purpose of paragraph 8's two-part valuation process was to create a dispute mechanism that would serve as an alternative to litigation.  Thus, it first gives the parties the opportunity themselves to reach agreement on the loss in value to the artwork knowing that if they could not, the market would determine that value through a public auction process that would set the compensation due to the Hollanders.  Under either scenario, the parties would avert the costs and delay attendant to litigating the postrestoration loss in value of the artwork.

30

The trial court's instructions to the jury scuttled this alternative dispute resolution process by directing the jury to evaluate the sincerity and reasonableness of the parties' valuation negotiations, and by allowing the jury to utilize a new and different measure of valuation found nowhere in the policy. Specifically, the trial court told the jury that if it found that XL Specialty, but not the Hollanders, had discharged the duty to negotiate the valuation reasonably and in good faith, then the jury needed to ascertain "the reasonable 'loss in value,' if any, to the paintings following the restoration." With this instruction, the court thus required the parties to litigate a valuation issue that would otherwise have been resolved by the public auction process and formula provided in paragraph 8. In doing so, the trial court turned a relatively expeditious and self-executing dispute resolution process into protracted litigation and a trial on an issue that paragraph 8 was intended to avoid. As set forth in *Kransco* and the other authorities cited above, the trial court erred in wielding the implied covenant to defeat the purpose of the parties' bargain.

Defendants argue that without the implied covenant, the first step in paragraph 8's alternative dispute resolution process would be superfluous. To the contrary, the first step gives the parties the opportunity themselves to control how much is owed under the policy and to reach whatever bargain they thought was in their respective interests. For instance, XL Specialty could attempt to negotiate a lower figure rather than risk paying a potentially higher figure derived from paragraph 8's auction proceeds formula. Similarly, the Hollanders might have chosen to forgo the public auction if their negotiations could yield a higher payout than their perception of the payout under the

31

auction formula.  Had the parties been able to reach such a compromise in their respective self-interest, it would have been binding on the parties.[22]  In the absence of agreement, the parties agreed to a formula for loss in value—confined to the difference between the $399,000 scheduled value of the artwork and the net proceeds from a public auction of the artwork.[23]

Although it may be true that implying an obligation that the parties negotiate sincerely and reasonably could enhance the utility of the first step in paragraph 8's alternative dispute resolution procedure, it would undercut the very purpose of paragraph 8, which was to provide an expeditious determination of loss in value and prompt payment of insurance benefits to the Hollanders as evidenced by the public auction formula in the second clause of paragraph 8.

---

[22] By arguing that the portion of paragraph 8 that allows the parties to agree on the postrestoration partial loss in value is not superfluous, defendants impliedly concede that this part of the policy is enforceable—i.e., that an agreement on loss in value made pursuant to paragraph 8 would be binding on the parties. (See *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2.)

[23] Although it does not appear that any invoice or other similar documentation from Sotheby's London is in the voluminous record before us, there is no dispute regarding the amount of the Hollanders' net auction proceeds.  Specifically, Special Instruction No. 1 informed the jury that $181,850 was the "difference between the scheduled value of the paintings under the policy and the auction proceeds received by the Hollanders," and defendants apparently concede in their respondents' brief that "the net auction proceeds [were] $217,150" (i.e., the difference between the scheduled value of $399,000 and $181,850).

Defendants argue that *Larwin-Southern California, Inc. v. JGB Investment Co., Inc.* (1979) 101 Cal.App.3d 626 (*Larwin*), and *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225 (*Brehm*), support the trial court's instruction implying the covenant of good faith and fair dealing into paragraph 8. Defendants correctly point out that *Larwin* "held the existence of certain subjective 'satisfaction clauses' did not render a party's promise to purchase property illusory because that party was impliedly obligated to determine their satisfaction or dissatisfaction in good faith." (Citing *Larwin*, at pp. 639–640.)

Notwithstanding defendants' accurate characterization of *Larwin*, the decision provides no guidance here. Defendants do not argue that the absence of an implied covenant of good faith and fair dealing in paragraph 8 would render the insurance policy illusory. In fact, the record shows consideration supported the policy, given the policy required the Hollanders to pay a premium of $24,966 and XL Specialty to pay "the difference between the amount so realized [at public auction] and the insured value of the Property" "[i]n the event the Insured and the Company cannot agree on the amount of loss in value" after restoration of the damaged property. Therefore, *Larwin* does not support the proposition that the Hollanders had a duty to attempt reasonably and in good faith to reach an agreement on loss in value with XL Specialty before invoking the policy's public auction formula. (Cf. *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 800–801, 808–809 [holding that it was unnecessary to "imply a covenant of good faith to protect the enforceability" of the licensing agreement in that case because, although the contract authorized the defendant to " 'refrain from' " manufacturing, selling, distributing, or advertising the

33

licensed music, the instrument was supported by "legally adequate consideration"—i.e., it required the defendant to make certain "guaranteed minimum [payments] no matter what efforts" it undertook].)

As defendants conceded at oral argument, *Brehm* is of limited relevance to this case.[24] As pertinent to this appeal, at issue in *Brehm* was an uninsured/underinsured motorist policy that provided for arbitration " '[i]f we and a person insured do not agree as to whether he or she is legally entitled to recover damages from an Uninsured Motorist or the amount of such damages . . . .' "[25] (See *Brehm, supra,* 166 Cal.App.4th at pp. 1230, 1241, italics omitted.) The plaintiff-insured alleged the defendant-insurer was liable for bad faith because it made a lowball monetary offer to settle what was an obvious case of serious physical injury in an effort to delay payment and to force the plaintiff-insured to accept the lowball offer. (See *id.* at

---

[24] At oral argument, defense counsel acknowledged that *Brehm* is relevant only insofar as the decision involved an insurance policy that allowed the insurer and insured to agree on the amount due thereunder. This concession regarding the limited relevance of *Brehm* is binding on defendants. (See *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 475 (*Consumer Cause, Inc.*) ["counsel's concessions and admissions at oral argument are binding"].)

[25] Although this provision referred to " 'damages from an Uninsured Motorist[,]' " the Court of Appeal concluded that it applied to underinsured motorist claims as well. (See *Brehm, supra,* 166 Cal.App.4th at pp. 1241–1242 [stating the policy "expressly grants the parties the right to arbitrate any dispute regarding a[n uninsured motorist] or [underinsured motorist] claim"].)

pp. 1230–1232.) The trial court sustained the defendant-insurer's demurrer, reasoning these allegations amounted to a " 'classic "genuine dispute" as to the value of a[n underinsured motorist] claim' " that is "insufficient to state a cause of action" for bad faith.[26] (See *Brehm*, at pp. 1233, 1237.)

In reversing the trial court's ruling, the appellate court rejected, among other arguments, the defendant-insurer's contention that because it had an express contractual right to demand arbitration, "its decision to seek arbitration cannot possibly constitute a breach of the implied covenant of good faith and fair dealing." (See *Brehm*, *supra*, 166 Cal.App.4th at pp. 1230, 1241–1242.) Citing well-established case law about an insurer's "duty to thoroughly investigate and fairly evaluate its insured's [underinsured motorist] claim" (*id.* at p. 1242),[27] the Court of Appeal held the covenant of good faith required the defendant-insurer to comply with this duty before resorting to arbitration: "[The insurer's] express contractual right to resolve

---

[26] As we explain in Discussion, part C.2, *post*, the genuine dispute doctrine allows an insurer to avoid liability for bad faith if it denied or delayed the payment of policy benefits due to a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim.

[27] *Brehm* cited *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713 (*Wilson*), for this proposition. *Wilson* held that the implied covenant of good faith and fair dealing in a first-party insurance policy requires the insurer to " 'fully inquire into possible bases that might support the insured's claim' before denying it." (See *Wilson*, at pp. 716, 720–721.) The Supreme Court explained that this duty " 'is essential' " to "protect its insured's contractual interest in security and peace of mind . . . ." (See *id.* at p. 721.)

any remaining disputes by arbitration is not inconsistent with its implied obligation to attempt in good faith to reach agreement with its insured prior to arbitration." (See *Brehm*, at p. 1242.)

It is true that the purpose of the implied covenant is "to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.) The *Brehm* court held the plaintiff-insured had alleged sufficient facts to demonstrate at the pleading stage that the insurer had breached this covenant by " 'frustrat[ing] the insured's right to receive the benefits of the contract in "prompt compensation for losses." ' [Citations.]" (See *Brehm*, *supra*, 166 Cal.App.4th at pp. 1236, 1240–1241, quoting *Waller*, at p. 36.)

Here, as detailed above, implying the covenant into paragraph 8 would frustrate the purpose of that provision, which is to provide a self-executing and expeditious process to determine the compensation owed to the Hollanders under the policy in the event of a partial loss to fine artwork. For this reason, we do not construe paragraph 8 to provide XL Specialty with a contractual right to require the Hollanders to negotiate the paintings' postrestoration partial loss in value reasonably and in good faith before they could recover the auction formula benefit. In fact, the trial court's reliance on the implied covenant to require the jury to determine the sincerity and reasonableness of the parties' negotiations on loss of value would produce the very outcome *Brehm*'s invocation of the implied covenant sought to avoid—i.e., the " 'frustrat[ion of] the insured's right to receive the benefits of the contract in "prompt compensation for losses." ' " (See *Brehm*, *supra*, 166 Cal.App.4th at p. 1236.)

In sum, the court erroneously imposed an obligation that was not "circumscribed by the purposes" of the policy. (See *Carma Developers (Cal.), Inc.*, *supra*, 2 Cal.4th at p. 373.) In light of this conclusion, we need not reach Gail's arguments that, "[e]ven if the implied covenant did impose duties on the Hollanders with respect to paragraph 8," (a) that implied covenant at "most . . . required . . . that they act in 'good faith' " and did not obligate them to "act 'reasonably' "; and (b) "[t]he court erred in treating the duty to try to reach agreement as a condition precedent." (Boldface omitted.)

## C. The Trial Court's Erroneous Interpretation of Paragraph 8 Was Prejudicial

"California's Constitution provides, 'No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532, quoting Cal. Const., art VI, § 13.) " ' "The effect of this [constitutional] provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the [appellant,]" ' " to wit, whether " ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.]' " (See *Conservatorship of Maria B.*, at p. 532.) " ' "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." [Citation.]' [Citation.]" (*Ibid.*)

"Instructional error ordinarily is considered prejudicial only when it appears probable that the improper instruction misled the jury and affected the verdict." (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213 (*Lundquist*).) " '[O]ur standard of review in this regard is the opposite of the traditional substantial evidence test. " '[I]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]' [Citation.] Accordingly, we state the facts most favorably to the party appealing the instructional error alleged[.] [Citation.]" [Citation.]' [Citation.]" (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 304 (*Bowman*).)

### 1. *The Erroneous Instruction Was Prejudicial as to the Breach of Contract Claim*

At oral argument, defense counsel conceded that if Special Instruction No. 1 were erroneous, then the jury could award only $181,850 on the contract claim and not the $19,500 that it did award. In accordance with defendants' concession on this point, we conclude the trial court's instructional error prejudiced Gail vis-à-vis her breach of contract claim.[28] (See *Consumer Cause,*

_____

[28] We construe defendants' concession as an abandonment of the following argument raised in their respondents' brief: "[E]ven if the trial court's reference to 'reasonable and good faith [efforts]' in Special Instruction 1 could be considered error, it would be harmless because the trial court charged the jury in the same instruction that their task was to determine whether [the Hollanders] acted in good faith, without mentioning reasonableness."

*Inc.*, *supra*, 91 Cal.App.4th at p. 475 ["counsel's concessions and admissions at oral argument are binding"].)

### 2. *The Erroneous Instruction Was Prejudicial as to the Bad Faith Claim*

The trial court instructed the jury that for Gail to prevail on her "claim that XL Specialty . . . breached the obligation of good faith and fair dealing by failing to pay benefits due under the insurance policy,"[29] she needed to prove the following elements: "1.  That the Hollanders suffered a loss covered under an insurance policy with XL Specialty[;] . . . [¶] 2.  That XL Specialty . . . was notified of the loss; [¶] 3.  That XL Specialty . . . unreasonably failed to pay policy benefits; [¶] 4.  That the Hollanders were harmed; and [¶] 5.  That XL Specialty['s] . . . failure to pay the policy benefits was a substantial factor in causing the Hollanders' harm."  The court further instructed the jury that "[t]o act or fail to act 'unreasonably' means that the insurer had no proper cause for its conduct," and "[i]n determining whether XL Specialty . . . acted unreasonably, [the jury] should consider only the information XL Specialty . . . knew or reasonably should have known at the time when it failed to pay policy benefits."  Neither side challenges these instructions.

The verdict form shows that XL Specialty prevailed on this cause of action because the jury did not find that XL Specialty had "unreasonably or without proper cause breach[ed] the

---

[29] In referring to claims against insurers, cases employ the terms "bad faith action" and "breach of the implied covenant of good faith and fair dealing" interchangeably.  (See, e.g., *Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 503.)

covenant of good faith and fair dealing that it owed to the Hollanders in the handling of the Kippenberger claim."[30] (Capitalization omitted.) In addition, defendants contend the trial evidence showed "XL Specialty . . . offered [the Hollanders] a lost value claim settlement of $19,950, which was 5% of the insured value . . . ." (See *Artal, supra*, 111 Cal.App.4th at p. 275, fn. 2.) The jury awarded Gail only $19,500 on the breach of contract claim, and, under Special Instruction No. 1, this figure represents the jury's finding on "the reasonable 'loss in value[ ]' . . . to the paintings following the restoration."

Viewing these facts in the light most favorable to Gail, because of the instructional error, it is reasonably probable that Special Instruction No. 1 affected the jury's finding that XL Specialty did not act "unreasonably or without proper cause" in rejecting the Hollanders' claim for $181,850—the uncontested valuation produced by the public auction process in paragraph 8. Specifically, it is reasonable to infer the jury absolved XL Specialty of bad faith liability simply because XL Specialty had offered to pay an amount ($19,950) that was in excess of the jury's finding of reasonable postrestoration partial loss in value of the paintings ($19,500), which finding Special Instruction No. 1 provided was the amount due under the policy. (See

---

[30] Recall the verdict form asked the jurors, "Did XL SPECIALTY INSURANCE COMPANY unreasonably or without proper cause breach the covenant of good faith and fair dealing that it owed to the HOLLANDERS in the handling of the Kippenberger claim?" Eleven jurors answered "[n]o" to this question, whereas one juror answered "[y]es" to it. Accordingly, the jury found that Gail failed to establish an essential element of her bad faith claim.

*Conservatorship of Maria B.*, *supra*, 218 Cal.App.4th at p. 532; *Bowman*, *supra*, 186 Cal.App.4th at p. 304.)

Had the trial court not told the jury that the Hollanders' entitlement to $181,850 was contingent on their "attempt[ ], in good faith, to reach an agreement on 'loss in value,' " or on XL Specialty's failure to discharge its reciprocal duty to attempt to reach an agreement in good faith, the jury would have needed to determine whether XL Specialty acted reasonably in refusing to pay the amount *actually* due under the policy—i.e., the auction formula benefit.

Additionally, as set forth in our Factual and Procedural Background, it is undisputed the Hollanders and XL Specialty were at an impasse regarding the paintings' postrestoration partial loss in value, and the text of paragraph 8 plainly states that XL Specialty "will pay" the auction formula benefit "[i]n the event the Insured and the Company cannot agree on the amount of loss in value . . . ."

Under these circumstances, there is a reasonable chance that absent the trial court's erroneous imposition of the implied covenant as a condition on the Hollanders' entitlement to the auction formula benefit, the jury would have found XL Specialty acted "unreasonably or without proper cause" in defying the express terms of the policy by refusing pay $181,850 to the Hollanders.  (See *Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir. 2001) 290 F.3d 1152, 1161–1162 (*Amadeo*) [holding, under California law, that " 'the meaning a layperson would ordinarily attach' " to a policy is probative of whether "the insurer's denial of benefits was reasonable"].)

Turning to the other elements of Gail's bad faith claim, the parties do not dispute that the Hollanders had notified

41

XL Specialty of the loss. Furthermore, because XL Specialty refused to pay $181,850 to the Hollanders, they had to litigate the breach of contract claim in order to recover the policy benefits to which they were entitled. Under her bad faith claim, Gail may recover her attorney fees incurred in pursuing those benefits.[31] Thus, there is a reasonable chance that Gail would have satisfied the causation and damages elements of her bad faith claim, regardless of whether she could show that XL Specialty's refusal to pay the auction formula benefit proximately caused her and Stanley to suffer any other potential type of damages.[32]

Defendants resist this conclusion, insisting that "[t]he record in this 15-year-old case, including the three-week trial, conclusively supports the jury's defense verdict on [Gail's] bad faith claim." Defendants support this contention with the following assertions, which are devoid of supporting record

---

[31] (See *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 533 ["An insurer's tortious breach of the implied covenant of good faith and fair dealing makes the insurer liable for all damages that are a proximate result of that breach. [Citation.] Thus, '[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.]' "].)

[32] (See *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 467, fn. 19 ["If the insured elects to proceed in tort [vis-à-vis a bad faith claim], recovery is possible for not only all unpaid policy benefits and other contract damages, but also extra-contractual damages such as those for emotional distress, punitive damages and attorney fees."].)

citations:  "The record shows that XL Specialty and its adjuster, Natasha Fekula, paid two significant claims by the [Hollanders] in full under the same Policy; fully paid to ship the Kippenberger paintings to and from Germany for first-class restoration of the cardboard frames and paid for that restoration in full; offered the Hollanders $19,950 in lost value settlement notwithstanding that multiple experts opined that the true lost value after restoration was either non-existent or, at most, half that amount; and refused [the Hollanders'] $181,850 lost-value demand based on an interpretation of [paragraph] 8 of the Policy with which two of the most experienced judges in the Superior Court of Los Angeles County agreed."

Aside from defendants' last assertion concerning two jurists' interpretation of paragraph 8, none of their contentions has any apparent bearing on whether "it appears probable that *the improper instruction* misled the jury and affected the verdict" on the bad faith claim.  (*Lundquist*, *supra*, 7 Cal.4th at p. 1213, italics added.)  Assuming arguendo XL Specialty paid two other claims under the policy, acted reasonably in facilitating and paying for the restoration of the paintings at issue here, and offered the Hollanders double the highest estimate of postrestoration partial loss in value provided by XL Specialty's experts, XL Specialty still may have acted unreasonably in refusing to compensate the Hollanders in accordance with the formula mandated by paragraph 8. (See *Maslo v. Ameriprise Auto & Home Ins.* (2014) 227 Cal.App.4th 626, 633 [" '[A]n insurer's obligations under the implied covenant of good faith and fair dealing with respect to first party coverage include a duty not to *unreasonably withhold benefits due under the policy*[,]' " italics added].)

43

Defendants' argument that XL Specialty relied on a policy interpretation with which two other judges had agreed appears to be an invocation of the genuine dispute rule.  Under that rule, " 'an insurer denying or delaying payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.'  [Citation.]"  (See *Wilson, supra*, 42 Cal.4th at p. 723.)  "A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds."  (*Ibid.*)

Although defendants do not identify explicitly the "two of the most experienced judges in the Superior Court of Los Angeles County" who "agreed" with XL Specialty's construction of paragraph 8, their recitation of this case's procedural history suggests they are referring to (1) the judge who denied Gail's motion for summary adjudication, and (2) the judge who issued Special Instruction No. 1.  Regarding the summary adjudication motion, the Hollanders sought a ruling that XL Specialty had a duty to pay them $181,850 plus statutory interest.  The trial court denied that motion in part because it found a triable controversy regarding "whether [the Hollanders] fulfilled the condition precedent in paragraph 8 of the XL Specialty Policy to obtaining the net auction shortfall between the insured value and auction price of the Paintings by making a good faith attempt to reach agreement with XL Specialty on the loss-in-value, if any, to the Kippenberger Paintings caused by the removal and

44

restoration of the Paintings' cardboard frames."[33] (Boldface omitted.)

We reject defendants' apparent reliance on the genuine dispute rule for two reasons. As an initial matter, it is reasonably probable that had the trial court not erroneously instructed the jury that paragraph 8 required the Hollanders to "attempt[ ], in good faith, to reach an agreement on 'loss in value,' " the jury would have found that XL Specialty "refused [the Hollanders'] $181,850 lost-value demand" based on the insurer's insistence that the loss in value be determined by an appraisal, and that the Hollanders could obtain the auction formula benefit only if they retained an appraiser who rendered an opinion differing from that of XL Specialty's appraiser. For instance, the trial court admitted into evidence a September 15, 2006 e-mail from Fekula to Stanley in which she asserted that, "[p]ursuant to [the] policy, loss in value, if any, will be determined by competent and disinterested appraisers," and that, "[i]f, after the appraisals, we cannot agree on a loss in value, then the property will be sold at public auction."

Based on this evidence, the jury could have found that XL Specialty's denial of the Hollanders' demand for $181,850 was not "based on" the Hollanders' failure to negotiate in good faith, but instead, on an appraisal condition found nowhere in paragraph 8.[34] (See *Amadeo*, *supra*, 290 F.3d at p. 1163 [holding

---

[33] The order on the summary adjudication motion does not explain why the trial court found that paragraph 8 obligated the Hollanders to make a good faith attempt to reach an agreement with XL Specialty on the postrestoration partial loss in value.

[34] Defendants do not claim the trial court erred in concluding, in Special Instruction No. 1, that (a) "the insurance

that the genuine dispute rule is inapplicable if the insurer adopted a policy interpretation "as a mere pretext for avoiding payment of the claim"].)

Additionally, even assuming XL Specialty's refusal to pay $181,850 was based on its belief the Hollanders were required to negotiate in good faith, construing the evidence in the light most favorable to Gail as we must, we cannot agree with defendants that no reasonable jury would have "conclude[d that] XL Specialty's handling of this claim constituted bad faith." (See *Bowman, supra*, 186 Cal.App.4th at p. 304.) Because paragraph 8 does not expressly impose a requirement to reach an agreement in good faith, the jury could have found that XL Specialty's "interpretation was sufficiently arbitrary and unreasonable" to negate the applicability of the genuine dispute rule. (See *Amadeo, supra*, 290 F.3d at p. 1162.) Further, the fact that two trial judges have disagreed with our reading of paragraph 8 does not necessarily establish the existence of a genuine dispute over the amount due under the policy. This is because contract language is not "reasonably . . . susceptible" to a party's interpretation thereof "merely because the parties (or judges) disagree about its meaning." (See *Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356.) Indeed, holding that the trial court's prior rulings regarding paragraph 8 trigger the genuine dispute rule "would have the practical effect of denying the

policy did not require the Hollanders to procure an appraisal of their paintings before exercising their rights under paragraph 8," and (b) paragraph 25's appraisal process did not directly apply to the Hollanders' partial loss claim. (See Factual and Procedural Background, part 6, *ante* [providing the full text of Special Instruction No.1].)

46

insured [her] right to appeal the trial court ruling[s] because, even if the trial court were reversed, the initial finding[s] would preclude bad faith as a matter of law. We find that such a conclusion in the insurance context . . . is unfounded." (See *Filippo Industries, Inc. v. Sun Ins. Co.* (1999) 74 Cal.App.4th 1429, 1441.)

In sum, we conclude the trial court's erroneous construction of paragraph 8 prejudiced Gail vis-à-vis the jury's verdict on the breach of contract and bad faith counts. Accordingly, the trial court's judgment must be reversed.

**D.    We Do Not Resolve the Other Issues Gail Raises**

Gail raises several other complaints on appeal. First, she challenges the award of costs to defendants. Yet, Gail concedes, and we agree, that we "need not reach that issue" because (a) the trial court's instructional error warrants reversal of the judgment, and (b) our order reversing the judgment vacates the costs award. (Citing *Ducoing Management, Inc. v. Superior Court* (2015) 234 Cal.App.4th 306, 314 ["A disposition that reverses a judgment automatically vacates the costs award in the underlying judgment even without an express statement to this effect."].)

Next, Gail asks us to instruct the trial court to "enter judgment for [her] on the breach-of-contract claim for $181,850" and "award [her] prejudgment interest on that award under Civil Code section 3287, subdivision (a) . . . ." She, however, provides no analysis in support of her entitlement to an order instructing the trial court to enter judgment for her on the breach of contract claim. For that reason alone, we need not address further Gail's request for a judgment awarding her $181,850 on her breach of contract claim. (See *Hernandez v. First Student, Inc.* (2019)

47

37 Cal.App.5th 270, 277 (*Hernandez*) ["We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' [Citation.]"].) This is not just a procedural concern. Although upon a retrial, the trial court's instructions must conform to our interpretation of paragraph 8 herein, there may be other issues relating to the breach of contract claim not raised in the first trial or considered in this appeal. Accordingly, we are in no position to enter judgment in Gail's favor, and leave the scope of the retrial of Gail's claims to the sound discretion of the trial court.

Additionally, Gail concedes that the bad faith claim must be retried. Thus, her request for judgment on the contract claim upon remand would appear to be premature, given that it could result in multiple judgments relating to the same controversy. (See *City of Hanford v. Superior Court* (1989) 208 Cal.App.3d 580, 588 ["As a general rule, there is only one final judgment in an action, one which finally determines the rights of the parties in relation to the matter in controversy."].)

Gail's plea for an "award [of] prejudgment interest" is premised on her entitlement to a judgment for $181,850 on her contract claim. Because she has not explained why we should direct the trial court to issue the $181,850 judgment on remand, her request for prejudgment interest is not yet ripe. (See *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573 ["California courts will decide only justiciable controversies. [Citations.] . . . Justiciability thus 'involves the intertwined criteria of ripeness and standing. A controversy is "ripe" when it has reached, but has not passed, the point that the

facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]"].)

Lastly, Gail asks us to instruct the trial court to conduct a trial on whether "eight of XL Specialty's affiliates" (i.e., all defendants other than XL Specialty) are "jointly and severally liable for its obligations" "on the theory that they were engaged in a partnership with XL Specialty . . . ." Although Gail (a) complains in the procedural summary section of her opening brief that the court denied her "motion to set a phase 3 trial on the partnership issue against" these defendants and (b) suggests the court should have submitted the matter to the jury, she offers no legal analysis on this issue. We thus do not address this issue further.[35] (See *Hernandez*, *supra*, 37 Cal.App.5th at p. 277.)

---

[35] We note that because our unqualified reversal of the judgment renders the case at large for the further proceedings, the trial court may revisit this issue upon remand. (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1499–1500 [" 'The effect of an unqualified reversal ("the judgment is reversed") is to vacate the judgment, and to leave the case "at large" for further proceedings.' "].) For that same reason, we need not specifically instruct the trial court to retry the bad faith claim.

## DISPOSITION

The judgment is reversed.  Appellant Gail Hollander is awarded her costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



MORI, J.*

---

50